## Cook *et al. versus* Cook.

1. J.'s land being to be sold by the sheriff, he arranged with P. to buy it it in for him. At the sale J. and P. informed bidders of their arrangement; they ceased bidding and P. bought the land. *Held*, that P. took as trustee for J.

2. In ejectment by P. against J., the court charged "P. can be declared trustee only on the ground that the purchase-money to the sheriff was furnished by J." *Held* to be error.

3. P. was a trustee merely for J., and J. was P.'s debtor for any part of the purchase-money unpaid.

4. The land was held by J. by articles. After the sheriff's sale B. paid

[Cook *v.* Cook.]

the balance due on the articles and obtained a deed, "subject to P.'s and J.'s equity." In ejectment by P. against J. and B., P. was not bound to tender to B. the amount paid by him. J. could tender and demand a conveyance from B.

October 21st 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Clarion county :* Of October and November Term 1870, No. 173.

This was an ejectment commenced August 9th 1866, by Philip Cook against John Cook and George N. Berlin, for 108 acres of land.

The case was tried August 24th 1870, before Barrett, P. J., of the 22d district.

The plaintiff's title was as follows: John Cook, his brother, one of ·the defendants, by article dated the 1st of August 1837, contracted with the agents of the Bingham estate for the land in dispute for the consideration of $162.75. The article was renewed by another dated November 1st 1849, for the consideration of $282.37, the debt and interest due on the original article. An execution for $103 was issued against John Cook on the 20th of December 1852, and his land extended at $50 per annum, and accepted by John Cook; on failure to pay the rent, the land was sold under a venditioni, to Philip Cook for $375, and the sheriff's deed acknowledged December 8th 1854. On the 10th of February 1865, John Cook receipted to the sheriff for $131.93, the surplus from the sale after payment of debt and costs. On the. 10th of June 1863, Philip Cook paid Judge Campbell, representing the Bingham estate, $170.98 on John Cook's article. George N. Berlin, the other defendant, paid $390.93 to Judge Campbell, that being the whole amount then due on John Cook's article, and a deed was delivered to Berlin, March 3d 1866, "subject to the equity of John Cook, Jr., and his vendee Philip Cook, as specified in the article of John Cook, Jr., ·with the Bingham estate." Before bringing suit, Philip Cook tendered to Berlin $400 in payment of the amount due on the contract.

The defendant, John Cook, alleged that Philip had bought in the property at sheriff's sale for him. He testified that when the land was about to be sold by the sheriff, he asked Philip to buy in the property for him, and Philip agreed to do so; a number of persons were at the sheriff's sale. John Zents was bidding and John Cook told him his arrangement with Philip; John and Zents went to Philip, who told Zents he was buying for John, Zents then said he would not interfere when one brother was buying for another; the land was struck down to ·Philip for $376; John testified that he did work for Philip, which he agreed should go towards paying for the land; also, that he paid Philip several sums of money on the same account, and that Philip was other-

[Cook v. Cook.]

wise indebted to him. Philip gave John his note for the surplus at the sheriff's sale. John cleared after the sale about 21 acres, enlarged the house and built a barn. Philip never claimed the property till the suit was brought. Zents testified that he went to the sale intending to buy the property if he could have got it for $700 with a clear title; it was then worth $1000 or $1200. He was informed substantially as stated by John Cook, the arrangement between John and Philip, and he did not bid any more.

C. E. Beaman was a bidder at the sale, but stopped on learning that Philip was bidding for John. William Ray testified in the same manner. There was evidence that after the sale Philip said the property was John's.

The defendants' points were:—

1. If the jury believe that there was an understanding and agreement between Philip Cook, the plaintiff in this case, and John Cook, defendant, before and at the time of the sale, that said Philip Cook should purchase the real estate sold on the execution in the case of G. G. Williams, assignee, &c., v. John Cook, and that said Philip Cook jointly with John Cook, and also by himself, induced Zents and others to desist from bidding at such sale; and by such means was enabled to purchase the land in controversy at a price below what it would have sold for at such sale, and below its actual value, such facts would make said plaintiff, Philip Cook, a trustee for defendants, and the jury should find for the defendants, subject to the payment of any balance unpaid of the purchase-money paid by plaintiff on sheriff's sale, and to Hon. James Campbell on the contract.

2. If the jury find for the defendants on facts stated in first point, and that the moneys actually paid by the plaintiff on the sheriff's sale, and also that paid to Hon. James Campbell on the John Cook contract, has been refunded or repaid by the defendant John Cook to the plaintiff, then their verdict ought to be for the defendants generally.

The points were refused.

The court charged:—

* * * "Was there a resulting trust created at the time of Philip's purchase at sheriff's sale? No fraud is alleged. There were no creditors to be affected. It was a contract, if any existing, in parol between John and Philip. How was John interested in depressing the value of the property at sheriff's sale? There was but the one judgment. It was more than paid. The surplus money went to John, and the more it sold for the greater the surplus would be.

"What was the agreement between the parties? This is a question for the jury. If Philip Cook is believed, he did make the purchase under a promise to let John remain upon the land

[Cook *v.* Cook.]

for some time.   He has let him live upon it since 1854.   If John is believed, he purchased it for him, and agreed to convey it to him on being paid the money invested.   There is some evidence corroborating both.   If such was the contract between these brothers, why did John take Philip's note for the surplus at the sheriff's sale?

"If Philip is to be declared a trustee for John, it must be because such was the arrangement at the time of the sheriff's sale. If John furnished the money to pay Philip's bid for the land, then the law would make him a trustee.   There is some evidence on his part that he did, which is positively denied by Philip.   This is a question for the jury.   [Philip can only be declared a trustee on the ground that the purchase-money for the sheriff's title was furnished by John.]   Whatever bargains or contracts they may have made afterwards could not change the character of the original transaction.   It was not enough that in an account between the parties years afterwards the indebtedness of Philip to John may be shown to be sufficient to cover the money paid.

"If the jury believe, under all the evidence, that Philip purchased the land at sheriff's sale for John, and that John furnished the money to pay the bid, they should find for the defendants. The plaintiff would not be entitled to any conditions.   His payment on account of the purchase-money would be a voluntary one.

"If the jury believe that Philip purchased the land and paid for it with his own money, the plaintiff is entitled to a verdict for the premises, to be absolute on the payment of the purchase-money and interest due to George N. Berlin."   * * *

The verdict was for the plaintiff upon condition of paying the unpaid purchase-money to Berlin.

The defendants removed the record to the Supreme Court and assigned the answers to their points, and the part of the charge in brackets, for error.

*W. L. Corbett* (with whom was *J. Boggs*), for plaintiffs in error.— Philip's conduct stops his mouth from asserting anything contrary to what he declared at and after the sale.   It created a trust for John: Brown *v.* Dysinger, 1 Rawle 408; Morey *v.* Herrick, 6 Harris 123; Sharp *v.* Long, 4 Casey 433; Williard *v.* Williard, 6 P. F. Smith 119; Robertson *v.* Robertson, 9 Watts 32; Kisler *v.* Kisler, 2 Id. 323; Abbey *v.* Dewey, 1 Casey 413; McCaskey *v.* Graff, 11 Harris 321; Sheriff *v.* Neal, 6 Watts 534; Plumer *v.* Reed, 2 Wright 46; Beegle *v.* Wentz, 5 P. F. Smith 369; Kellum *v.* Smith, 9 Casey 158.

*B. J. Reid* (with whom was *G. W. Lathy*), for defendant in error.—If there was fraud at the sheriff's sale, John was a participant and cannot take advantage of it: Haines *v.* O'Connor, 10

[Cook v. Cook.]

Watts 313. At most this was but the breach of a parol agreement which will not make the purchaser a trustee: Jackman v. Ringland, 4 W. & S. 140; Fox v. Heffner, 1 W. & S. 372; Barnet v. Dougherty, 8 Casey 371. Except by fraud in the purchaser or payment of the purchase-money, a resulting trust will not arise: McCulloch v. Cowher, 5 W. & S. 427; Sample v. Coulson, 9 Id. 62; Kisler v. Kisler, 2 Watts 323; Geiger v. Miller, 12 Harris 109.

The opinion of the court was delivered, November 6th 1871, by
READ, J.—John Cook entered upon the premises in controversy under an article of agreement with the trustees of the Bingham estate, dated the 1st of August 1837, and on the 1st of November 1849, by an article of agreement in writing from the said trustees, which was a renewal of the former one, purchased the same for the consideration of $282.37. He cleared land, made valuable improvements, and with his family resided thereon at the commencement of this suit, on the 9th August 1866.

On the 7th August 1852, a judgment was obtained against John Cook for $103, on which an alias fi. fa. was issued, and levied upon this real estate, extended at a rent of $50 per annum, and accepted by John Cook, and upon his failure to pay, a vend. exponas was issued upon which this land was about to be sold. John sent for his brother, Philip Cook, to come over and buy the property in for John Cook at the sheriff's sale, which he did for $375; the surplus money, after paying debt and costs, John receipted for to the sheriff, but did not receive it. From the 1st December 1854 to 9th August 1866, John Cook remained in undisturbed possession of the land, paid the taxes, cleared land, built a barn, and cut timber thereon, which he had manufactured into lumber on the mill of Philip Cook, the plaintiff.

On the trial of the cause John Cook testified: "My property was up for sale on that judgment; I had some money, but not enough to pay the debt; I asked Philip to come over and buy the property for me; I wanted him to furnish a part of the money for a time, until I would get my money from Bethlehem; he agreed to come over and buy the property. He came; he was here two or three days; Zents was a bidder; William Ray came up to myself and Philip, and asked if the property had to be sold; Philip told Ray that he was buying the property in for me; Zents was bidding, and I went and told him my arrangement with Philip; he said if that was the case he would not bid on it. We went to Philip, and Zents asked him; Philip told him he was buying it in for me; then Zents said he would not interfere where one brother was buying for another. The property was knocked down to Philip for $375." Zentz, Beaman, Ray and Dunkle, all agree as to these facts, and if these witnesses, counting John Cook, are believed, then John Cook's story is true, and fixes Philip with a trust for John.

[Cook *v.* Cook.]

Philip Cook, on 10th June 1863, paid the trustees of the Bing
ham estate $170.38 on the John Cook, Jr., article, and on the 19th
February 1866 George N. Berlin paid $390.93, the balance in full
of the John Cook article, and received a deed, "subject to the
equity of John Cook, Jr., and his vendee, Philip Cook, as speci-
fied in the article of John Cook, Jr., with the Bingham estate."

There was evidence of money paid to Philip by John on ac-
count of the judgment, and also claims, which, if established,
would repay all Philip's advances. But the view taken by the
court rendered all this evidence entirely nugatory. One cardinal
error runs through the whole case, and makes it unnecessary to
consider the errors assigned in detail, to the answers to the de-
fendants' points, and to the judge's charge.

The court evidently considered there could be no resulting trust
unless John furnished the money to pay Philip's bid for the land.
"Philip," say the court, "can only be declared a trustee on the
ground that the purchase-money for the sheriff's title was fur-
nished by John."

Now it is perfectly clear that Philip purchased for John, and
his conduct at the sale in preventing bidders and getting the pro-
perty at a low price, far below its real value, would be a wilful
and deliberate fraud, if he did not fulfil his agreement with his
brother, publicly acknowledged at the very moment of the pur-
chase. If he was not a trustee for his brother, then it was de-
frauding him out of what would have been given by others,
amounting to several hundred dollars. Philip was a trustee merely
for his cestui que trust, John is simply his debtor for any advance
remaining unpaid, and for the $170.38 paid the Bingham estate ;
but he was not entitled to tender the $390.93 to George N. Ber-
lin, and demand a conveyance of the legal title. John Cook
could tender and require a conveyance of it.

The defendants' 1st and 2d points should have been affirmed.
The facts should be submitted to a jury, with proper instructions.

Judgment reversed, and *venire de novo* awarded.