## Levy's Estate.

Argued April 20, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Roy Martin Boyd,* for appellant.

*R. Sturgis Ingersoll,* with him *Boyd Lee Spahr,* of *Ballard, Spahr, Andrews & Ingersoll,* for appellee.

*Murray H. Spahr, Jr.* and *Francis Shunk Brown,* for appellees.

OPINION BY MR. JUSTICE DREW, May 18, 1937:

Laurance B. Levy died June 5, 1930, and his last will and testament designated the Real Estate Land Title and Trust Company as executor and trustee. After directing the payment of several legacies, decedent therein declared "All the rest and residue of my estate of whatsoever nature and wherever situated, I direct my Executor to hold in trust for the following purposes, first disposing of all properties and investments that are not returning suitable interest on their value and reinvest the money obtained in Legal Investments." Violet I. Levy was named life tenant of the net income from the trust estate remaining after the payment of two annuities.

Among the assets of the estate were 1,498 shares of a total of 1,500 shares of the capital stock of the Pennsylvania Range Boiler Company, a Pennsylvania corporation, with a par value of $50.00 a share. In addition, decedent also owned the realty upon which the corporate business was and is being conducted in the city of Philadelphia. The corporation owed decedent at the time of his death $127,022.77. At the inception of this action on November 15, 1935, $75,000 of this sum was still due, as evidenced by an unsecured demand note of the corporation payable to the estate.

In November, 1935, the trustee entered into an agreement to sell the 1,498 shares to David E. and Morgan

S. Kaufman for $35,000. Therein, it was provided that after the Kaufmans obtained control the corporation would purchase from the estate, the above-mentioned realty for $45,000, and further, that the corporate indebtedness to the estate amounting to $75,000 would then be paid in annual installments of $7,500.

On November 15, 1935, Miss Levy petitioned the Orphans' Court to restrain the trustee and the prospective purchasers from consummating the sale, on the ground that the price agreed upon was grossly inadequate. The matter was referred to a master and during the course of the lengthy hearings, expert appraisers and accountants stated their conclusions. Their testimony occupies almost a thousand pages in the record. Before the conclusion of the proceedings counsel stipulated that the price proposed to be paid for the realty was fair, which removed further consideration of that matter from the case. The master's first report recommended that the sale of the stock should be restrained because of inadequacy of price. Exceptions were taken to that report and at argument thereon the Kaufmans stated to the court in banc that they would pay $39,000 for the stock, if their offer were immediately accepted and approved. A decree was entered dismissing the exceptions and directing the trustee "to reopen negotiations for the sale of this stock, at a price of $39,000 or better, in order to obtain the highest available price therefor."

The trustee proceeded as directed, conferred with interested parties, particularly a Mr. Buckley and Mr. Kaufman, and it was only when the sole definite offer came from the latter, and the best price obtainable was $39,000, and the trustee feared losing that and the possibility of a sale, that it closed with the Kaufmans. It retained this stock for five years, during all of which time, it was its duty to dispose of it if possible and invest the proceeds in legal securities inasmuch as it was not returning a suitable interest on its value as required

by testator's will. The trustee had diligently tried to sell the stock but was unable to do so. It got in touch with persons and corporations that might be interested, but, with one exception, without result. That exception was the Kaufmans who in good faith offered to buy. The other alleged bids, those of Miss Levy and Mr. Buckley, were not bids at all. Not once, in any way, did they place themselves in the position of making a definite offer for the stock.

On May 29, 1936, the trustee sold the stock, delivered the certificates and received $39,000 in cash. It contracted to sell the real estate to the corporation, and the Kaufmans agreed that the corporation would pay the estate the $75,000 debt in annual payments as previously agreed. Thereupon Miss Levy petitioned the court to set aside the sale upon the ground that it was made fraudulently and for an inadequate consideration. The master's second report recommended that the sale be confirmed and the petition dismissed. A decree of December 21, 1936, confirmed the sale and dismissed the bill without prejudice to petitioner's right to seek a surcharge at the audit of the trustee's account. This is an appeal from that decree, upon the grounds that (1) the Kaufmans are not bona fide purchasers, (2) the sale is tainted with fraud, (3) there was no necessity to sell, and (4) the price was inadequate. To determine these questions correctly a more detailed review of the facts immediately surrounding the transaction, as disclosed by the evidence, is necessary.

At the time of decedent's death, the corporate deficit was approximately $45,000 and by January 1, 1933, $75,000. The Pennsylvania Capital Stock Tax report for 1933 valued the capital stock at $11,671.08. Net profits for 1933 as shown by the Federal Corporate Income Tax return for that year totaled $6,355.81. A certified public accounting firm employed by the trustee to audit the corporate books in 1934 submitted an auditor's report showing profits for that year, after setting up a

reserve for federal income tax, to be $35,066.31. The accuracy of these figures was not contradicted. The profits for 1935 were variously estimated at between $18,000 and $20,000. During these five years no dividends were paid, inasmuch as the capital was impaired. The Pennsylvania Range Boiler Company was a small industrial corporation with some eighteen competitors, and owned no patents to guarantee it a trade advantage. Petitioner's evidence was based upon the book value of the business as a going concern, and upon potential profits. One expert called by her fixed the value of the capital stock as $80,171.84, while an appraiser estimated the worth of the company as $103,916.84, both as of November 20, 1935. These included sizeable credits for goodwill. Respondent's expert valued the capital stock, as of the same date, at $59,240.89.

These facts indicate some of the difficulties the trustee faced in selling the stock. It was not until 1935 when the corporation was making a profit that it was able to interest a purchaser. It then got in touch with several prospects, among them Miss Levy, Mr. Buckley, and the Kaufmans. Miss Levy's offer contained many conditions and was very properly rejected by the trustee. Mr. Buckley appeared for a client whom he refused to name and stated a willingness to pay $39,000 for the stock upon the condition that he first be allowed to examine the corporate books. After the decree directing the reopening of negotiations, he again refused to disclose the prospective purchaser, refused to raise his offer, and declared that he would do so only if someone else met his price. He persistently declined to name his client. As said by the court below, "disclosure of the name of the purchaser was an important factor in the sale. It enabled the trustee, in the exercise of its discretion, to determine the probable ability of the corporation under the management of the purchaser, to comply with the other terms of the agreement." It must be remembered that the purchaser's identity was most im-

portant to the trustee since the corporation's ability to repay the $75,000 loan to the estate depended to a great degree on the integrity and capacity of the new owner. Mr. Buckley did not commit himself or his client to anything, which made it impossible for the trustee to rely on him.

The sole question raised by this appeal is whether the sale was induced by fraud. If it was not, appellant cannot succeed in this proceeding. After a thorough examination of the voluminous record we are convinced that the nearest she came to proving her allegation of fraud is found in the testimony produced regarding inadequacy of price. Even if the price were inadequate, and we do not say it was, mere inadequacy does not make fraud. There must at least be gross inadequacy to create even an inference of fraud. While it is undoubtedly true that gross inadequacy of price is some evidence of fraud and may justify review by this court upon that question, no such problem is presented in this case. There is certainly no gross inadequacy here. The Kaufmans obtained the stock for $39,000 cash, while Mr. Buckley, with many conditions attached, spoke of $42,000. The latter sum is the highest figure mentioned for the stock in the thousand-page record. It can readily be seen when it could not be secured there was nothing to shock the conscience in accepting $39,000 in cash. There is nothing in the testimony indicating bad faith, improper motives, even negligent conduct or imprudent business management on the part of the trustee. Not a word in the record reflects on the Kaufmans.

This sale was consummated. In cases of this type a distinction must be drawn between agreements to sell and consummated sales: see *McCullough's Estate,* 292 Pa. 177. In the former, as in *Crawford's Estate,* 321 Pa. 131, where the price is inadequate, the performance of the contract will be restrained. But where the sale is consummated, as it is here, an entirely different result is necessarily reached. An honest purchaser is entitled

316

to retain the benefits of his bargain. If an executor or trustee is recreant or exercises grossly bad judgment, the estate is protected by surcharging him on the audit of his account: *Cascaden v. Cascaden,* 140 Pa. 140. The only forum for determination of the question of mere inadequacy of price, in cases of consummated sales, is the Orphans' Court, at the audit of the trustee's account, and the proper procedure the making of a demand for surcharge.

There is no merit in the assignments not discussed. All assignments are overruled.

The decree is affirmed at appellant's cost.