Reichert's Estate

2

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

*I. Emanuel Sauder*, and *Albert B. Sofian*, for petitioner.

*Ellis Rudman*, for purchasers.

*James G. Gill*, for Charles G. Glazer, cotrustee.

*Bronte Greenwood*, for respondent.

*Nathaniel Speck* and *Clinton A. Sowers*, for Walter Hatley, cotrustee.

*James R. Wilson*, for substituted minors.

LADNER, J., April 12, 1946.—The exceptions before us are to the master's report* recommending that the prayer of a petition to set aside the conveyance of decedent's real estate be granted.

The proceedings arose on a petition of Louis Bell for citation to set aside the conveyance of premises 1064 North Second Street, Philadelphia, sold at private sale by Charles G. Glaser and Walter F. Hatley, trustees under the will of Frank Reichert, deceased, to Ben Tizer and Rose, his wife. Petitioner was a disappointed bidder for the property and complains that he was deprived of the opportunity to pay a higher price because of the fraud of the purchasers and the trustees. The petition joins as respondents the purchasers, the trustees, and James G. Gill, Esq., counsel for the trustee, Glaser. This court (see opinion by Bolger J., 52 D. & C. 254), directed that the Kensington National Bank, substituted guardian for the minor beneficiaries

---

*Leo Weinrott, Esq. was the master.

4

of the trust, be joined so that the interest of these minors might be fully protected. The petition charges fraud and inadequacy of price as the grounds for asking that the sale be set aside. The trustees had a power of sale under paragraph 16 of decedent's will. From the master's report we adopt the following statement of facts:

"On September 5, 1944, the day following Labor Day, the trustees executed and delivered to one Simelsohn, a realtor and agent for the Tizers, both an agreement for the sale of premises 1064 North Second Street and a deed conveying the said premises to Benjamin and Rose Tizer, his wife, in consideration of the payment by several checks of an aggregate sum of $3,500. The settlement was consummated in the offices of James G. Gill, attorney for the trustee, Glaser. There was no examination of title or title insurance. At 9 a.m. on the morning of September 6th, the next day, the deed was recorded.

"At the time that this sale was consummated petitioner, Louis Bell, was also negotiating with Charles Glaser, one of the trustees, for the purchase of the same property. Bell and the Tizers were bidding against each other. Within 10 days before this sale, Bell had increased a previous $3,000 offer to $3,500, after the Tizers had matched his $3,000 offer and then offered $3,200 for the property. Bell was represented in the negotiations by a realtor named Benjamin Soffian and the Tizers were represented by Simelsohn, also a realtor.

"Bell and the Tizers were competitors in the retail linoleum business. Bell conducted a store at 1060 North Second Street and the Tizers were the tenants in the estate's property at 1064 North Second Street. Apparently Bell wanted this property in order to evict Tizer and thus stifle such competition as Tizer offered. The feud between the Tizers and Bell was apparently a

bitter one and of long duration. Both of the trustees were acquainted with the differences between these merchants and they apparently favored their tenants, the Tizers. The estate of the decedent was in an excellent position to profit by this situation as the desire of these people to acquire this property was sufficiently strong to induce both to bid more than the market value that this property would have otherwise enjoyed.

"Unfortunately for the estate, the trustees did not reap the full benefit of this special market. Each of Bell's offers was submitted to the Tizers in order to give them an opportunity to bid further. But the Tizer's offer of $3,500 made on or about August 30th was not held under consideration long enough to enable Bell to raise it by the presentation of an agreement to pay $4,500. Bell's agent, Soffian, testified that he did offer $4,500 on August 31st by telephone and that he brought an agreement signed by Bell to pay this sum to Mr. Gill on Tuesday, September 5th. During this period Mr. Gill held a deposit check of Bell, in the amount of $1,000, originally deposited on the $3,500 offer of August 30th. Mr. Gill denied receipt of this $4,500 agreement, but admitted closing with the Tizers at $3,500 on the fifth and making settlement in his own office simultaneously.

"On September 5th, Tizer's agent, Simelsohn, met with Mr. Glaser and Mr. Gill in Gill's office at about 1:30 in the afternoon. He procured a deed signed by Glaser and prepared by Mr. Gill. Simelsohn then took this deed to Mr. Hatley for his signature and finally obtained that signature about 5:30 p.m. on that day. During the same afternoon Simelsohn saw both Bell and his agent Soffian at Soffian's office by appointment. He pretended to act as a peacemaker in connection with the competition for this property and thereby succeeded in inducing Bell and Soffian to refrain from communicating with Mr. Gill that afternoon. At this

meeting, Simelsohn concealed the fact that he was then concluding a settlement for the Tizers with the trustees.

"Bell contends that the sale to the Tizers was the result of a conspiracy between the trustees' attorney, James G. Gill and the Tizers acting by their agent, Simelsohn. The trustees denied receipt of the $4,500 offer from Bell but conceded that they favored the Tizers. They were also concerned about the possibility of a settlement of the differences between the Tizers and Bell which would have had the effect of destroying the market for this property. Mr. Gill denied any wrongdoing in connection with his representation of Mr. Glaser.

"V. *Statement of the Questions Involved.*

"The questions presented by the pleadings and the testimony are the following:

"1. Did the trustees and James G. Gill conspire with Simelsohn, agent for the Tizers, to sell the property to the Tizers at a lower price than Bell would have paid?

"2. If there was no such conspiracy, did the Tizers through Simelsohn, their agent, defraud the estate of the benefit of a higher offer from Bell by inducing Bell through false representations to refrain from communicating with the trustees while Simelsohn was rushing to completion an agreement of sale, a settlement and a conveyance, all in one afternoon?

"3. May a third party, whose only interest in the estate is to purchase the property, raise these questions and seek to set aside a sale induced by fraud?

"VI. *Discussion.*

"The master, after a careful consideration of all of the testimony and the pleadings, recommends a negative answer to the first of the three questions. The master does not believe that there was any conspiracy between the trustees or either of them or Mr. Gill and the Tizers. It is true that Soffian testified that he tele-

phoned an offer of $4,500 to Mr. Gill on the 31st of August and that he brought an agreement at that price to Mr. Gill on the morning of the fifth of September. The trustees and Mr. Gill denied receipt of such an offer by telephone or otherwise. Mr. Gill and Mr. Glaser denied that Soffian appeared on the fifth of September or at any other time with such an agreement. Soffian's own testimony corroborates these denials. Soffian admitted that he would have called Mr. Gill on September 5th, in Simelsohn's presence if Simelsohn had not dissuaded him from so doing. It is probable that if either of the trustees or Mr. Gill had called either Mr. Bell or Mr. Soffian that the Tizer offer would have been raised by Bell. Why such an effort was not made by the trustees was not explained by their testimony. This failure cannot be made the basis of a conclusion of fraudulent conspiracy, however questionable it may be from the point of view of the failure of the trustees to exercise diligence.

"The fact that the settlement was rushed to so prompt a conclusion is a suspicious circumstance. Generally, titles are searched by title companies and settlements are made in the usual course of business by title company clerks. Here title examination and insurance were both waived. However, these were waivers made by the Tizers which did not concern the trustees. If the vendees choose to take title without benefit of search or policy, the vendor has no standing to complain. Simelsohn, and not the trustees, chose the method of settlement employed in this case.

"Finally, the division of a five percent commission between Glaser and Gill is urged as proof of fraud. The commission was openly charged and openly taken. Whether the trustees and their counsel earned this commission and whether they had a right to help themselves to it is not a question involved in this proceeding. The fact that there was no concealment here belies any allegation of fraud in connection therewith.

"The second question requires an affirmative reply. Simelsohn was the tool of the Tizers and their mastermind as well. The Tizers employed Simelsohn to acquire this property for them. They authorized his manipulations and adopted his acts. Finally, they accepted the fruit of his fraud.

"Simelsohn accomplished his fraud on this trust estate by lulling Bell and Soffian into a false feeling of security and inducing them to take no action at a time when they otherwise would have communicated with the trustees. The evidence is clear that Soffian negotiated with the trustees daily from August 30th to Labor Day and that he had a tentative appointment to call Gill on the day following Labor Day. Simelsohn selected this day to make his appointments both with Mr. Gill and with Soffian and Bell. Simelsohn called Soffian to arrange for the appointment at the very time when he was persuading Gill to consummate both an agreement of sale and a conveyance of title simultaneously. It was during the critical waiting period, when the Tizer settlement was delayed for a few hours, that Simelsohn saw Bell and Soffian. Thus Bell's agent, Soffian, was induced to refrain from communicating with Mr. Gill or with Mr. Glaser long enough for Simelsohn to obtain a deed executed by both trustees. This was a delicate maneuver requiring accurate timing, but Simelsohn managed it too well. He was clever in his dealings with the trustees, but he over-reached himself and his principals, the Tizers, when he fraudulently induced Bell to refrain from communicating his offer to the trustees on the afternoon of September fifth. Simelsohn, acting for and with the approval of his employers, the Tizers, prevented this estate from receiving the benefit of Bell's higher offer.

"September fifth was a very busy day for Simelsohn. He called at Mr. Gill's office at 1:30 for the settlement. The deed and settlement sheet were prepared and the

consideration paid by check. Then Simelsohn took the deed, signed only by Glaser to Mr. Hatley's place of business at 510 W. Girard Avenue for execution by him. Hatley sent Simelsohn to his attorney's (Clinton A. Sowers, Esquire) office to have the deed approved. It was during this interval that Simelsohn found time to meet with Bell and Soffian at Soffian's real estate office. Only one reasonable inference can be drawn from this conduct of Simelsohn. This visit on the date of the planned settlement was no coincidence. Simelsohn made the appointment in order to forestall the possibility of a higher bid being made by Bell before the settlement was completed. When Simelsohn saw that the settlement would not be completed until late afternoon, he communicated with Soffian and made this early afternoon appointment.

"Here, fraud in the form of artifice and trick was resorted to by the Tizers through Simelsohn to procure this property at a lesser price than they would have been obliged to pay if fraud had not been exercised to stifle competition. The Tizers cannot be permitted to profit by their own fraud. Simelsohn's act was Tizers' act. The pleadings, the evidence and the admissions made of record during the course of the hearings establish the agency of Simelsohn beyond doubt. He was employed not only to obtain this property for Tizer but also to prevent Bell from acquiring it.

"This situation is not unlike the cases of the use of fraud or artifice to procure property at sheriff's sale at an under value. In such cases, the purchaser takes title as trustee for the person misled: Hartzell v. Whitmore, 271 Pa. 575; Faust v. Haas, 73 Pa. 295; Cook v. Cook, 69 Pa. 443. Here both Bell and the trustees were misled and defrauded. Since the conveyance was induced by the fraud of the grantee, to the detriment of the estate, it must be set aside.

"Fraud is a comprehensive term which embraces all the multifarious methods that human ingenuity can

devise and which are employed to gain an advantage over another by false suggestions or by concealment of the truth. In Thorne's Estate, 344 Pa. 503, 511, the term is further defined in the following language:

" 'Fraud is practised when deception of another to his damage is brought about by a misrepresentation of fact or by silence when good faith required expression.'

"Here, the Tizers, through Simelsohn, practiced just such a fraud upon this estate in order to obtain this property at a lower price than Bell would have paid.

"The third question must also be answered in the affirmative. Bell is no stranger to these proceedings. He was an active bidder for the property. He, alone, has both the information and the incentive required to initiate these proceedings. The trustees, who did not seek a higher price from Bell on September fifth, would not be expected to reveal their own neglect by a complaint. The guardian of the cestuis que trustent took no active part in the management of the trust property. The court is charged with the duty of supervising the management and disposition of the property entrusted to its appointed fiduciaries. The jurisdiction of the court extends to 'The disposition of the title to real estate of decedents, and of persons disabled from dealing therewith, in order to render the same freely alienable and productive to the living owners thereof;' Orphans' Court Act of June 7, 1917, P. L. 363, sec. 9 (g).

"Here a fraud has been perpetrated upon trustees appointed by and under the control of this court. The petition of any informant or complainant armed with the necessary proof should be received even if the petitioner has no interest in the trust estate."

The master in his report with respect to the Kensington National Bank, substituted guardian of the minor beneficiaries, recommends that the citation as to it should be dismissed. In an equity proceeding it makes no difference whether a party is styled plaintiff

or defendant: the court will afford to each any relief to which such party is entitled. In this case, speaking through Bolger, J., we decided that the guardian was a necessary party to these proceedings and directed it to appear and answer on the merits and participate in all the subsequent phases. We think it is the prime duty of a guardian to actively assert and protect the interests of its minor under all circumstances; so in this case, when the guardian's attention was called to what was going on, by service of a copy of the petition and citation, it should have promptly appeared and answered without waiting for the court to direct such action, and by active participation sought to obtain for its ward the highest price possible for the property in question. The master's suggestion that the citation as to it be dismissed, is disapproved.

The master then, in due form, made 32 findings of fact, four conclusions of law and recommended that the citation issued against Charles G. Glaser and Walter F. Hatley, trustees, and James G. Gill, Esq., attorney for Hatley, and The Kensington National Bank, guardian of the trust beneficiaries, be dismissed; that the citation issued against the Tizers be sustained, and a decree entered adjudging that they were guilty of fraud in obtaining title to the premises in question, and the trustees' sale of the premises to them be canceled and the trustees ordered to expose the property for resale immediately. To the master's findings, his recommendations and the proposed decree, all parties filed exceptions aggregating 83 in number. Much labor has been saved to the court by the painstaking manner in which the learned master reëxamined the matter before him in the light of exceptions and the care with which he prepared the supplemental report, all in strict accordance with our local rule, 8(e), and our suggestions in Hays' Estate, 33 D. & C. 153. We now proceed to dispose of the exceptions in the order that they were argued before us.

*Exceptions of Ben and Rose Tizer, the Purchasers*

These exceptants filed 19 exceptions. The first eight are exceptions to the master's findings of fact. In Rosenthal's Estate, 35 D. & C. 117 (1939), affirmed 339 Pa. 488, we held that in disposing of such exceptions that fact findings of a master or auditor are entitled to the weight of a verdict of a jury and clear error must be pointed out before we will disturb them. Though this rule does not apply when the findings are from undisputed facts or uncontradicted evidence or result from deduction and reasoning instead of from weighing conflicting evidence. See authorities there cited.

So far, therefore, as the first eight exceptions of the Tizers are concerned, no clear error has been pointed out either at the argument or in the brief of counsel; hence we dismiss these exceptions.

Exceptions 9, 10, relate to the master's conclusions of law from his fact findings that the respondents through their agent obtained title to the premises, 1064 North Second Street, by resort to a fraudulent trick or artifice. The master recommends these exceptions be dismissed and we approve his recommendation for the reasons set forth by him in his discussion hereinbefore quoted.

By the 11th, 12th and 13th exceptions the Tizers complain of the master's recommendations of the relief to be granted to the petitioners, viz:

(1) That respondents, Ben Tizer and Rose Tizer, be adjudged guilty of fraud in obtaining title to premises, 1064 North Second Street, Philadelphia; (2) the sale of said premises be canceled, and (3) the trustees ordered to expose the property for resale immediately, and (7) that the decree be conditioned upon the posting of a bond by Louis Bell in the sum of $1,000 with the clerk of the court to indemnify the estate against

loss in the event that resale of the premises does not bring a price of $4,500 net to the estate.

The master's recommendation that the 11th exception be dismissed is approved by us for the reasons set forth in the master's discussion and it is therefore dismissed.

The master, upon reconsideration of his report in the light of the 12th exception felt that his last recommendation (7) should be changed so as to increase the bond to be posted by Louis Bell to the sum of $2,500, conditioned upon the property not bringing the price of $5,000 net to the estate. We approve the modification by the master of his original recommendation. There would be no purpose in setting aside the sale and canceling the deed unless $5,000 be paid by the proposed purchaser or someone else, and the indemnity of $2,500 is not too little to require in the circumstances.

In so ruling we have noted that petitioner, Bell, at the argument, objected to this modification as well as certain other modifications of the master's original report, and asked leave to file exceptions thereto. We now refuse such leave because such additional exceptions are unnecessary under local rule 8(e) as we construe it. The mistaken notion of their necessity is probably due to the master's assumption that he was authorized by local rule 8(e) (which reads somewhat differently from the replaced rule 8(h)) to sustain or dismiss the exceptions filed with him. We must admit the part of the new rule which reads:

"It shall then be the duty of such auditor or master to reëxamine the subject and supplement his report by full consideration of the objections seriatim, setting forth concisely in his supplemental report his reasons for sustaining or dismissing each exception" (see Hays' Estate, 33 D. & C. 153)—is not clear.

It might well be interpreted the way the master here did, as empowering him to sustain or dismiss the exceptions instead of the former practice of merely

recommending such action. However, it was not our intention to change the practice but rather to incorporate into the rule the procedure approved by us in Hays' Estate, supra, cited in the new rule. When Hays' Estate is read in conjunction with the language above quoted, it will be seen that no change was intended and that what we meant was that the masters in their supplemental reports, should set forth their reasons why they have modified their reports if they find the exceptions well founded, or if not well founded, why their dismissal is recommended. In other words, clarity required our rule to read, "setting forth concisely in his supplemental report his reasons *why the court should sustain or dismiss* each exception". Consequently, we regard the exceptions filed with the master sufficient not only to raise the objections to his report as originally filed, but the objections to his report as modified, and the party aggrieved by the modification of the report, may be heard at the argument on that question without encumbering the record with additional exceptions.

After sustaining the 12th exception of the Tizers, the master redrafted his decree as originally recommended by changing the amount of the security required as a condition of the decree taking effect from $1,000 to $2,500, so that it now reads:

"This decree shall be effective only upon the posting of security in the amount of $2,500 . . . within 15 days from the date hereof, conditioned upon the resale of the premises at a price of not less than $5,000 net to the estate."

After again dividing the costs between respondents, Tizers and petitioners, the master added to the decree:

"Should Louis Bell fail to post the bond herein required, all of the above costs and fees shall be paid by him."

No exceptions were filed by petitioner Bell to the requirement on his part to post security, but he does

object to the increase of the amount of security and the conditions as to costs. We have considered carefully the argument of petitioner's learned counsel, who must concede that the matter is one for the exercise of the sound discretion of this court. This court takes the view that the only wholly blameless parties in this transaction are the minor beneficiaries of the trust who are entitled to the fullest protection. If Bell and the Tizers were at any time to compose their differences (and it must be remembered that Bell's agent sought to do this very thing when Tizers' agent tricked him), the innocent minors might suffer a loss. Against this possibility the master wisely sought to protect them and we approve of his manner of doing so. We sustain the master's ruling in this regard.

Tizers' exception 13 complains that the master's recommendations are inconsistent in that he absolves the trustees of fraud and at the same time finds the Tizers guilty of that charge. We agree with the learned master that there is no inconsistency in his ruling. It is not necessary to find the trustees guilty of fraud. It is sufficient if they were over-reached, imposed upon, or the purchaser was guilty of a fraud, of a trick, or deception.

In exception 14, the Tizers object to the fact that the master did not include a finding that the fair market value of the property, 1064 North Second Street, Philadelphia, was in excess of $3,200.

The fair market value of the property is not what some expert necessarily calls it but is the price which a willing buyer will pay for a property that the vendor is not compelled to sell. But in the case before us the so-called market value has ceased to be material because as the master well said: "The cupidity of the parties has set perhaps a higher value of this property than others might deem wise to pay for it." We find no merit in this exception, and the same is dismissed.

Exceptions 15 to 19 raise the single question whether the master erred in recommending the following portion of his decree:

"That the deed . . . to Ben Tizer and Rose Tizer be hereby set aside, canceled and forever rendered null and void with directions to the trustees to reopen negotiations with all interested parties for the sale of said premises in order to obtain the highest price therefor, and that the purchase price of $3,500, less half of the costs of these proceedings and of the fees allowed to the master, be returned by the trustees to the said Ben Tizer and Rose Tizer."

The exceptants question by these exceptions the jurisdiction of this court to set aside the consummated sale on the ground of fraud. We have no hesitation in finding that the master was correct in his conclusion, adequately supported as it is by his full discussion of the subject in his original report, which appears on pages 2, 3, and 3A, thereof. We will not expand this opinion by quotation therefrom but merely say our jurisdiction is firmly established by Orr's Estate, 283 Pa. 476, McCullough's Estate, 292 Pa. 177, Levy's Estate, 326 Pa. 310, and Kane v. Girard Trust Co., 351 Pa. 191 (1945). Exceptions 15, 16, 17, are dismissed.

There is likewise no merit in the 18th and 19th exceptions complaining of the imposition of costs; the exceptants were not only the losing but guilty parties and have no cause for complaint. These exceptions are also dismissed.

The question whether the whole costs should have been imposed on these respondents will hereafter be considered in connection with the disposition of the petitioner's exceptions.

### Exceptions of Petitioner, Louis Bell

The petitioner filed 43 exceptions to the findings of fact, conclusions of law and the recommendation of the master. The master upon consideration found three of

them, the second, the eighth and the sixteenth, well founded and recommends the modification of his fact findings and report accordingly. We approve his recommendation, and the effect thereof is that the master pursuant to the second exception adds to his findings of fact that "Simelsohn was the agent of Tizers who had full knowledge of all his actions and not only authorized the perpetration of this fraud but also adopted and accepted the benefits thereof".

Pursuant to the eighth exception the master makes the additional finding that the trustee, Hatley, called up Glaser (his co-trustee) when Simelsohn called at Hatley's place of business at about 2:30 p.m. on September 5, 1944.

Pursuant to the sixteenth exception the master makes the additional finding that the respondent "Gill" (attorney for trustee Glaser) "and Glaser, one of the trustees, divided between themselves $175 commission as well as 10 dollars charged by Gill to Simelsohn for preparing the deed to the Tizers".

The rest of the petitioner's exceptions are recommended by the master to be dismissed for reasons which in his supplemental report appears to us to be adequate. However, as the able counsel for the petitioner has so earnestly argued them, we will briefly refer to them. By exceptions 13, 14, 17, 18, 40, 41, 42 and 43, complaint is made that the master should have found fraud on the part of one of the trustees from the fact that the trustee, Glaser, committed a fraud on his co-trustee by falsely informing him that he (Glaser) had received all of the cash consideration when, in fact, that was not true. The exceptant's counsel contends that the undisputed facts of record show that on September 5, 1944, Simelsohn, the Tizers' agent, came to Mr. Gill's office, about 1:30 p.m. and made his alleged settlement for the property. The price to be paid was $3,500; that Gill had in his possession $320 of Simelsohn's money. The latter

then put up a check for $2,500. While the balance, together with some other charges and adjustments amounting to $718.80, he was to bring in later. Gill gave Simelsohn the deed which Glaser had signed earlier in the day. Simelsohn took the deed to Hatley (co-trustee), telling him that he had put up all the money and asked him to sign it. Before doing so, Hatley called Glaser on the phone and the latter, in the presence of Gill, told Hatley that he had in his possession the whole consideration and that it was in cash. As the result of this statement, Hatley signed the deed. It was not until later in the day that Simelsohn gave Gill, who was not the attorney for the estate but merely attorney for Glaser, a check for $718.80 made out in Gill's name, which Gill deposited in his own bank account the next day and from which he remitted the money due the estate three days later, September 9th.

In view of the fact that we have approved the master's finding that the fraud and artifice on the part of the purchaser was sufficient to set aside the deed, we find no purpose to be served by sustaining these particular exceptions of the petitioner in view of the fact that the full consideration of the property was afterwards paid. In doing so, however, we wish it to be clear that we do not approve of one co-trustee so dealing with another. Full and frank disclosure and honest statement of facts is due by one trustee to another. What no doubt led to the overzealousness of the trustee, Glaser, and his attorney, Gill, to speed up and assure settlement being made to the Tizers was the fact that both of them were sharing in the commissions that Tizers' agent was to receive. We will have more to say about this when we come to consider the exceptions filed by both Gill and Glaser.

By exceptions 9, 10, 11, 19, 29, 31, 32, 33 and 35, petitioner Bell raises the following questions: First, whether the deed was invalid because as executed it

did not contain the seal of one of the trustees. Second, because the master should have found from the contradictory testimony of the notary, Simelsohn (who was also Tizers' agent), that Glaser never appeared personally before the notary and consequently the acknowledgment was defective.

An inspection of the deed shows that the trustee, Glaser, did not affix a seal to his name and from this it is argued the deed is void. We do not agree with this proposition because, since the Act of April 30, 1925, P. L. 404, sec. 9, 21 PS §10, the addition of the seal to a deed or other instrument concerning real estate is no longer indispensable: Pittsburgh Terminal Coal Corp. v. Bennett, 73 F.(2d) 387 (C. C. A. 3, 1934), cert. den. 293 U. S. 617. Counsel for this exceptant, Bell, contends, however, that this act only renders a seal unnecessary where the deed has been acknowledged by the grantor before an officer of the Commonwealth authorized by law to take such acknowledgments. Counsel, however, is in error. He has evidently confused the validating Act of May 12, 1925, P. L. 582, 21 PS §276, relating to conveyances made before the date of that act, with the Act of April 30th, same year, above quoted.

As to the second proposition, namely, that the deed was not properly acknowledged because neither of the trustees personally appeared before the notary who certified to taking the acknowledgment, it is sufficient to say that we agree with the learned master that a finding that the deed was not properly acknowledged is immaterial, for an acknowledgment of a deed is not necessary in order to pass title, if the deed is properly signed and delivered: Maguire v. Preferred Realty Co., 257 Pa. 48 (1917). The purpose of an acknowledgment is to make the instrument recordable and the purpose of the Recording Act is to protect a subsequent innocent purchaser or lien creditor of the former owner; but it would not make the deed void as between

the grantor and grantee, nor any subsequent grantee of the grantor who had notice.

The master's recommendation is approved; the exceptions raising these questions are dismissed.

### Exceptions of James G. Gill and Charles G. Glaser

The exceptions of these two exceptants being largely similar will be treated together. The first two exceptions of each and the third of Mr. Gill, are, as the master pointed out, improperly drawn. They are multifarious and include a number of unrelated subjects. These exceptions are dismissed. Exception 3 of Glaser charges error in the master's fact finding to the effect that Glaser told his co-trustee that he had all the consideration money, which statement was untrue. The master's finding is supported by the testimony of Mr. Hatley. This exception is dismissed. Exception 4 of Gill complains that the decree nisi did not include the master's recommendation that the citation against him be dismissed. The master reports this exception well founded and has corrected his decree accordingly. This exception is sustained pro forma.

Exception 4 of Glaser charges error in that the master did not in his decree require a $5,000 bond of the petitioner instead of $1,000. We have seen that the master has, in his revised decree attached to his supplemental report, increased the security requirement to $2,500, which we have approved. This exception, therefore is dismissed. By exception 5 Glaser charges error in the master's omission to provide in his decree for deduction of all credits due the estate by the purchaser. The master reports this exception well founded and has revised his decree accordingly. This exception is sustained.

By the sixth exception trustee Glaser objects to the imposition of costs on the estate, and, as we understand it, the master imposed one half of the costs on the

Tizers and one half on the estate. He felt that since the estate will profit by the neighborhood feud, and receive a much higher price than the ordinary value of the property, under the circumstances it ought to bear a share of the costs of these proceedings.

On the question of costs, it is well settled that the orphans' court is a court of equity and has complete control of all questions as to costs. The general rule which would compel the party against whom the decree is made, to pay costs, is not inflexible; the disposition of costs is largely in the discretion of the court and may be charged wholly to the fund; see 1 Hunter's Commonplace Book, p. 285, and the cases there cited.

After careful consideration we have come to the conclusion that the equitable disposition of costs would be to approve the master's recommendation to charge one half thereof against respondents, the Tizers, and if the petitioner's actions result in the estate receiving at least $5,000, then the balance of the costs should be paid out of the fund. We add, however, that when the trustees come to file their account, the auditing judge may well find that in the circumstances present these costs should be charged against the compensation of the trustee Glaser for his failure to adequately guard the interests of the trust. We do not pass upon that question now but leave it open for consideration at the accounting for the reason that the minors may then be of age, in position to press or not to press for such a surcharge as to them seems best.

The circumstance that we refer to is the finding by the master that the trustee Glaser and his attorney agreed with the agent Simelsohn that they were to receive a share of his commissions for bringing about the sale to the Tizers. At the argument Mr. Gill explained that there was no concealment, but it was the intention to give the trust estate the benefit of this share of the commission.

In the A. L. I. Restatement of Trusts, sec. 170, comm. n, it is said:

"The trustee violates his duty to the beneficiary if he accepts for himself from a third person any bonus or commission for any act done by him in connection with the administration of the trust."

In Miller's Estate, 14 Dist. R. 163, at p. 166, Judge Penrose of this court applied the same rule to attorneys and pointed out that attorneys, agents and fiduciaries all render themselves unable to adequately safeguard the interest of clients or cestuis que trust, when they accept such commissions. See also 3 Bogert on Trusts and Trustees, sec. 543, 2 Scott on Trusts, sec. 170, p. 903, and authorities there cited condemning the practice as disloyal.

The case before us is but another illustration of the reason for the principle. Both the trustee and his counsel ceased to be impartial and ceased to regard with singleness of purpose the interest of the trust alone the moment they agreed to accept commissions. Instead of dealing with both prospective purchasers even-handedly, they sought to favor the one over the other. The unseemly haste with which settlement was made; the failure to communicate to Bell's agent the Tizers' offer while making known to Tizers' agent Bell's offers; the misrepresentation made to the co-trustee as to the full consideration being paid; the attempt to have the proceedings dismissed upon preliminary objections without a hearing; the filing and arguing exceptions to the master's decision, which was for the manifest benefit of the trust, instead of devoting their efforts to seeing that the trust estate was adequately protected; all this eagerness or overzealousness to defend the Tizers' bargain at the expense of the trust, warrants the suspicion that they may have been more interested in protecting their commissions than in getting the best possible price for the trust assets.

There remains to be mentioned that the strange inability of these two respondents to see any impropriety in their actions makes us wonder concerning the extent to which this practice of sharing commissions to the detriment of trust beneficiaries exists generally. The increasing number of cases in which property has been sold at a price far too low, or under circumstances showing undue favoritism to a favored broker, makes us wonder whether there is not a secret sharing of commissions by agents and trustees or with employes of trustees. Perhaps we ought, under our supervisory powers, adopt a rule requiring brokers, as a condition to collecting commissions, to furnish an affidavit available to inspection by the cestui que trust, that the broker has not paid or agreed to pay directly or indirectly to the trustee or any employe of the trustee or to the attorney of the trustee, any share of the commission. . . .

### Exceptions of Walter Hatley, co-trustee

We agree with the learned master that the first two exceptions of respondent trustee, Walter Hatley, are without merit and not material to the controversy. Also, the third exception covers substantially the question raised in the fourth exception of the trustee, Glaser, which the master regarded as well-founded to the extent of increasing the security required from petitioner, from $1,000 to $2,500, and the condition that the price be $5,000 instead of $4,500. The fourth exception objects to the cost of the official stenographer, together with the master's fee being directed to be borne equally by respondent, the Tizers and the estate, the estate's half thereof to be paid out of the principal. This exception is substantially the same as that included in the sixth exception of Glaser. What was said there applies equally here. Whether or not this half of the costs will be ultimately imposed upon both trustee

or only upon Glaser, or at all, will be determined at the future accounting.

The fifth, seventh and eighth exceptions raise objections to the form of the decree and the completeness of the remedy afforded. The master has modified the decree to cover these objections. We approve the master's disposition of them. The ninth exception the master terms "peculiar". It reads:

"The learned master erred in the first conclusion of law, to wit, the orphans' court has jurisdiction to set aside this consummated sale on the ground of fraud. The basis of the exception is that the learned master having exonerated the trustees from fraud or any imputation thereof, the court is divested of jurisdiction."

There is no merit in this exception. Whether the fraud was committed *by* the trustees, or *on* the trustees by the purchaser, the supervisory power of this court over the fiduciaries amenable to it, remains unimpaired. The exception is dismissed.

### Exceptions of the guardian

The guardian filed two exceptions. The first as to the imposition of one half of the costs upon the estate has already been discussed in relation to the similar exceptions filed by the trustees. For the reasons there given, this exception is dismissed.

The second exception covers error on the part of the master in not providing for rental of said premises from September 5, 1944, to the date of the final payment at the rate of $35 a month, less credit for taxes and water rent paid. The master has rectified this error in his amended decree and his recommended disposition of this exception is approved.

And now all the exceptions having been disposed of as hereinbefore indicated the revised decree of the master is approved and will be executed simultaneously with the filing of this opinion.